UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. |
| CLARK UNIVERSITY, DAVID ANGEL, DAVIS | ) | |
| BAIRD, DENISE M. DARRIGRAND, ADAM | ) | |
| KEYES, SARAH BERGERON, JACQUELINE | ) | |
| CAPOMACCHIO, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT AND JURY DEMAND**

1.     This claim arises out of the dismissal of the plaintiff from Clark University ("Clark") in May 2015.  The plaintiff was a freshman student who was admitted on substantial financial aid, and earned a position on a varsity sports team.  He was accused of committing rape on another freshman student three months after having engaged in consensual sex with her in his dormitory room.  The sexual misconduct disciplinary board ("SMDB") was held at a time of intense debate, both on the campus and among students on social media, where students were criticizing the university's handling of sexual assault.  Just hours before the hearing, Clark hosted a screening of an emotionally-charged, graphic documentary about sexual assault on campus, and the person who would serve as the board chair participated in that program.

2.     Clark, without warning or explanation, removed plaintiff from his room.  He was formally accused and notified of the charges the next day, and found guilty of sexual assault, sentenced to dismissal from the university and branded a sex offender, eleven days later. The plaintiff was denied the benefit of the "fair practice" procedures promised him in Clark's 2014-2015 Student Handbook[1].

---

[1]Hereinafter referred to as "*Student Handbook*," the relevant portions of this document are attached hereto as Exhibit A.

3.      Although Clark's Sexual Violence Policy[2] outlines the rights of a student accused of a violation of the policy, the plaintiff was denied those rights, including notice of those rights, an investigation into the allegation, and adequate time for preparation.  The plaintiff's board hearing was scheduled during the hectic week before final examinations were to be administered.

4.      Plaintiff was prejudiced by the accusation of an assault alleged to have happened three months in the past, as he was not afforded time to conduct an investigation of his own records or attempt to locate or retrieve evidence or identify witnesses who may have relevant information.

5.      Although the plaintiff proffered his cellular telephone records indicating hundreds of texts between the plaintiff and the complainant consistently before and after the alleged assault as evidence, the chair refused to distribute them to the board as irrelevant.  After the finding of the board, the plaintiff was able to recover numerous text messages between the plaintiff and the complainant, demonstrating both the complainant's interest in going to the plaintiff's room on the night in question, and also continuing a relationship with the plaintiff after that night and repeatedly inviting him to her room.  Clark, both in the appeals process and on review by Clark's president, refused to consider the text messages as evidence and upheld the board's decision, refusing to take any action to restore the plaintiff's status, record or dignity. The plaintiff has suffered significant damage from Clark's action, impeding his education, damaging his reputation and causing psychological and emotional harm.

## JURISDICTION AND VENUE

6.      Clark has breached its contractual duties and other obligations to the plaintiff, as well as violating Title IX of the Educational Amendments of 1972(20 U.S.C. § 1681) and 42 U.S.C. § 1981.

7.      The plaintiff is a resident of Connecticut, and, upon information and belief,  the defendants are residents of Massachusetts.  The amount in controversy is over $75,000.00.

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

---

[2] The Sexual Violence Policy is attached hereto as Exhibit B, and incorporated into the Student Handbook by reference (see Ex. A, pg. 23).  It can also be accessed electronically at http://www.clarku.edu/offices/dos/pdfs/Sexual_Misconduct_Policy.pdf.

9.      Venue is proper under 28 U.S.C. § 1391(b).

PARTIES

10.     The plaintiff resides in Connecticut and was formerly a full-time student at Clark University.  The plaintiff is herein referred to as "John Doe" or "plaintiff".   He was a recipient of a substantial merit scholarship as well as other financial aid.  He was an athlete at his high school in Connecticut where he graduated with honors in sports and academics.  He enrolled at Clark in the fall of 2014.

11.     The defendant Clark University ("Clark") is a federally-funded, private liberal arts college located in Worcester, Massachusetts, with approximately 2200 enrolled undergraduate students.

12.     The defendant David Angel is the president of Clark University, a position he has held since July 2010, and makes the final decision regarding disciplinary action .

13.     Defendant Davis Baird is the provost of Clark University, a Title IX associate for the university, and was responsible for reviewing the decision of the SMDB or designating someone else to do so.

14.     Defendant Denise M. Darrigrand was, at the time of the events giving rise to this action, the Vice President for Student Affairs/Dean of Students and a Title IX associate of Clark University. She received the initial complaint, approved the initial decision by the SMDB and denied John Doe's appeal.

15.     The defendant, Adam Keyes was Director of Residential Life and Housing at Clark University, as the Chair of the SMDB, and authored the SMDB decision.

16.     The defendant, Sarah Bergeron was the Senior Assistant Director of Residential Life and Housing at Clark University and was initially assigned as the Chair of the SMDB.

17.     The defendant, Jacqueline Capomacchio, was the Title IX Coordinator of Clark University.

FACTS

18.     The Clark University administration has encouraged passionate involvement in anti-assault programs, presentations and campaigns for several years.  The campus efforts broadened the definition of sexual assault and at the same time reduced the amount of evidence, the standard of evidence, and the rights of the person accused, resulting in a very prejudicial and female-centric environment on the campus.  This campaign was at its peak during the time John Doe was accused of sexual assault and faced the SMDB.

19.     Rights of male students rapidly deteriorated after April 2, 2011, when the Office of Civil Rights of the U.S. Department of Education issued its letter ("Dear Colleague Letter") to school districts, colleges and universities receiving funding under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq., and its regulations, administrators.  The letter outlined obligations of these institutions to take steps to end sexual harassment and sexual violence.  It defined sexual violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol..." The Dear Colleague Letter encouraged schools to side-step the criminal justice system by implementing their own hearing system, and to judge allegations of sexual assault by a "preponderance of the evidence" standard instead of a higher standard, such as "clear and convincing evidence,[3]" which was already lower than the criminal justice standard of "beyond a reasonable doubt."

20.     Clark sought and received a grant from the Department of Education to establish a campus program, Clark Anti-Violence Education (CAVE), which characterizes its campus sexual assault an "epidemic."

---

[3] This is the standard by which other offenses at Clark are judged by the UJB (Exhibit A, page 31, paragraph 11.)

21.     President Obama launched the *It's On Us* campaign in September 2014, intended to rally administration and students to take action to prevent sexual assault. Clark participates in that program, as indicated by numerous posters around the campus, including in the dean of students office.

22.     On the first Thursday in March, 2015, Clark University celebrated "White Ribbon Day," sponsored by an organization formed to address violence of men against women.

23.     In conjunction with that event, on March 10, 2015, Clark University screened "*It Was Rape*," a film primarily about sexual assault against women, intended to incite high emotions about the subject, which was followed on March 12, 2015, by a symposium in Clark's Tilton Hall, sponsored by a campus organization, TOPICS, where attendants could gather for invigorating discussions about and support for victims of sexual assault.

24.     Also during March, a social media page on Facebook.com, titled "Clark Confessions, " was inundated with comments from Clark students expressing anger and rage at the Clark administration for their handling of allegations against a person identified as the "Wright Hall rapist" and his continued presence on campus.

25.     On April 6, 2015, Clark University, as part of it's participation in the *It's On Us* campaign, posted a 90-second video produced by the university that featured more than 90 faculty, staff and students pledging to fight to end sexual assault. Defendant Angel and Defendant Keyes both appear in that video, stating "It's on us."

26.     On April 21, 2015, The Dean of Student's Office (Defendant Darrigand), in cooperation with the Residential Life and Housing Department (Defendants Keyes and Bergeron) hosted a showing of the documentary "The Hunting Ground." The documentary, a graphic exposé challenged students and administrators to be strident in the prosecution of alleged sexual assaults. The showing was advertised on the social media page of the Residential Life and Housing where Keyes is the director; Keyes was the chair of the Sexual Misconduct Hearing Board for Doe the very next day.

27.     Clark's student newspaper, *The Scarlet*, featured an article on April 23, 2015, entitled "Students Frustrated with University's Approach to Sexual Assault," chastising the university for, among other things, not revealing the name of the alleged "Wright Hall rapist," charging the university with failing to properly respond to allegations of sexual assault, and calling for a "naming and shaming" campaign.  This was the also the date that the SMDB decision was delivered to John Doe.

## SUE SMITH'S COMPLAINT

28.     On December 9, 2014, John Doe and Sue Smith,[1] both freshmen at Clark, agreed to study for exams for a class they had together.  What began as studying quickly developed, through hundreds of electronic messages, into a flirtatious relationship, that continued through the winter break and into the first week of spring classes.  On Thursday, January 15, 2015, the fourth day of the spring semester at Clark, the two students exchanged numerous texts, culminating in Sue Smith going to John Doe's room at approximately 1:30 a.m. on January 16, 2015.  They had a consensual sexual encounter in John Doe's upper bunk while his roommate, CW, slept in the lower bunk.

29.     Smith and Doe continued to text and she attempted to spend more time with him over the next several days.  Smith got angry that Doe did not make time to spend with her and broke off their relationship on or about January 24, 2015.

30.     Smith and Doe continued to live in the same dormitory, but had little contact.  She began dating another freshman, JR, almost immediately after her break up with Doe.  On April 10, 2015, approximately three months after their sexual encounter, Smith filed a complaint with the college alleging that Doe had raped her.  Her formal written complaint, filed with Defendant Darrigrand, is attached hereto as Exhibit C.[4]

31.     In a very public manner, John Doe was evicted from his dorm room, without explanation, to another location on campus by two female campus police officers at about 9:00 pm on

---

[4] All documents attached as exhibits have personally identifying information redacted to protect the privacy of the parties herein referred to as John Doe and Sue Smith.  Other students will be referred to only by their initials to protect their privacy.

Sunday, April 12, 2015. Late on Monday, April 13, 2015, he received an email from defendant Sarah

Bergeron ("Bergeron") informing him that a complaint had been made against him for sexual assault.  In

that email, he was directed to attend a pre-hearing "interview" with Bergeron the following day, April

14, 2015, and was told that a Sexual Misconduct Board Hearing  ("Hearing") was scheduled for

Wednesday, April 22, 2015.  He was informed that he would receive an additional letter by email

providing additional information about the Hearing.

        32.      The meeting on Tuesday, April 14, 2015, was the first time John Doe became aware of

Smith's allegations concerning the events of January 16, 2015.  Bergeron identified herself as the chair

of the SMDB, then read Smith's statement aloud to Doe, but he was not allowed to take a copy of the

written statement to review.  He was then instructed to provide the names of his advisor and any

witnesses to the incident as soon as possible.  All further communications with Bergeron were by email.

On the same day, Doe provided the name of his attorney and his witness by email to Bergeron.  He was

instructed to have the witness, CW, provide a written statement no later than 9:00 a.m., Friday, April 17.

2015, if it was to be included as evidence.

        33.      On April 15, 2015, Bergeron advised Doe that, while his attorney would be allowed to

attend the Hearing, she would be limited to consulting with him and not advocating for him.  He was

also told that he was limited to reading a written statement, which was to be provided before the hearing

so that the board and the complainant would have an opportunity to read it.

        34.      On April 17, 2015, in response to inquiry by Doe, Bergeron advised Doe that, after

reading his statement, the board members and Sue Smith would be allowed to ask questions of him.  She

referred him to a "hearing letter," which he believed to be the initial letter he received referred him to the

*Student Handbook*, as he had received no additional correspondence of that type.

<u>CLARK FAILED TO INVESTIGATE THE ALLEGATIONS</u>

        35.      In accordance with Clark's *Student Handbook,* upon a report of sexual misconduct, the

college is required to take "immediate and appropriate action to investigate." (Exhibit A, pg. 31)  John

Doe was removed from his dorm on April 12, 2015, apparently based upon the complaint made April 10, 2015.  Although a Hearing was scheduled by April 13, 2015, before Doe had even met with Bergeron, the only evidence against Doe was a statement by the complainant. There was no investigation.

36.     Knowing on April 14, 2015, that Doe had identified at least one witness, an investigation by Clark should have minimally included an interview with CW, who was identified as present at the time of the sexual encounter.  An investigation by Clark could have included any electronic communications between John Doe and Sue Smith that she may have retained, demonstrating the congeniality with which they continued to engage with one another, as well as interviews with friends and roommates of the complainant to determine the reliability of the complaint. There was simply no investigation of any type, as required by the Dear Colleague Letter.

37.     On the other hand, with only three days to obtain and provide evidence before the deadline of April 17, 2015, imposed by Bergeron, John Doe accessed his cellphone log and printed the record of electronic messages exchanged with Smith.  It revealed a consistent pattern of exchanges, initiated by Smith, resuming just hours after she left Doe's room.

38.     After the hearing and during the appeals period, John Doe continued to search for evidence that would support his defense.  He utilized a diagnostic computer program which recovered many of the long-deleted electronic communications between Sue Smith and himself for the several days after their sexual encounter. These communications included text messages from Sue Smith inviting John Doe to her room on more than one occasion, and all were conspicuously devoid of malice or concern.  John Doe offered these communications on appeal, but defendant David Angel upheld the appeal without receiving or reviewing the communications.

CLARK'S "FAIR PRACTICES" ARE NOT FAIR

39.     Clark's *Student Handbook* states that fair practices will be followed and defines the manner in which a complaint will be processed.  The "fair practices" identified in the *Student Handbook* are stated in seven paragraphs enumerated A-G.  The first four paragraphs, A through D, describe the

8

process for when a complaint of a violation of the Student Code of Conduct is received.  It involves a one-on-one meeting with a judicial staff member who notifies the accused of the allegation and then attempts to elicit an admission of responsibility before recommending a sanction to the dean.  The fifth paragraph is a mish-mash of ideas, first discussing the staff member's options if the accused does not admit responsibility, then stating that the accused's right to an appeal if he disagrees with the finding, and after that, identifying situations where the first four paragraphs will be apparently be disregarded. Paragraph F states that the initial staff member will not participate as a board member, and the seventh paragraph, G, states that not only the accused but also the complainant may appeal a board decision.

40.     These "fair practices" appear to be an alternative process than the process followed by either of the actual disciplinary boards, but discuss nothing about fairness of the processes.

<u>THIS DISCIPLINARY HEARING DID NOT ABIDE BY CLARK'S WRITTEN POLICY</u>

41.     After his initial interview with Sarah Bergeron, John Doe and his lawyer prepared for the Hearing, as suggested by Bergeron, by reviewing the following Clark policies and procedures contained in and referred to in the *Student Handbook*:

a. The *Student Handbook* states that the University Judicial Board ("UJB") is comprised of students, graduate students, faculty, and administrators with the associate dean of students as the chair.  (Exhibit A, page 30) Infractions that may result in suspension are handled by the full board, while a "simplified board" of three persons will hear all other infractions.  In contrast, the SMDB is always comprised of the University Judicial Board Chair or its designee, and three non-student members of the campus community that may be faculty, staff, or administrators who "understand the complexities and legal implications associated with these specific policy violations."[5]

---

[5] The board members were Paul E.Phillips, a swimming and diving coach, and Jennifer Plante, and Michelle Bata, both affiliated with the LEEP Center, an academic resource center.

b.  Both the UJB (Ex. A, pg. 29) and the SMDB (Ex. A, pg. 32) are subject to the procedures of "fair practices" as discussed above. The right of the accused to Clark's "fair practices" are also stated in the Sexual Violence Policy.  (Ex. B, pg. 7)

c.  The UJB, in allegations ranging from tampering with window screens to assault, must apply the evidentiary standard of "clear and convincing evidence" and determine responsibility by a majority vote.  This is the process whether in a "simplified board" handling minor infractions or a full board hearing where suspension or expulsion may be considered as a sanction.  The SMDB, on the other hand, is comprised of three board members, as with the "simplified board," but may only apply the "preponderance of the evidence" standard[6], also coming to a decision by a mere majority vote.(Ex. A, pgs. 30-32.)

d.  According to Clark's policy, "Sexual Misconduct Hearing Board members receive specialized training on how to respond and investigate sexual misconduct."  (Ex. A, pg. 31)  The requirement to conduct such investigation is contained in the first  paragraph of the SMDB procedures.

42.     The *Student Handbook* states, in describing the SMDB, on page 32, paragraph 12, that "the UJB invokes an evidentiary standard of "preponderance of the evidence" when determining whether a violation has occurred."  The Sexual Violence Policy, incorporated by reference in the *Student Handbook*, (Ex. A, pg. 23) states that "the University Judicial Board invokes an evidentiary standard of "clear and convincing" when determining whether a violation has occurred. (Ex B, pg. 9 ) Not only are these statements seriously inconsistent, but there is no requirement that the chair or board members be trained in or knowledgeable about the application of these evidentiary standards or any other legal terms.

43.     Clark's University Judicial Board ("UJB") chair is responsible for designating a Hearing Board Chair and three neutral, non-student members to serve as the SMDB. As noted above, fair

---

[6] This is claimed by Defendant Darrigrand to be the applicable standard, although it is not clearly the standard in application as will be discussed herein.

practices require that "the staff member conducting the pre-hearing interview will not participate in the judicial board hearing." (Ex. A, pg. 30)  However, for SMDB, the policy states that the chair schedules individual meetings with the claimant and respondent and then chair's the Hearing. (Ex. A, pg. 30) In this case, John Doe met with defendant Bergeron who identified herself as the chair and read Sue Smith's formal complaint aloud.  She set the deadlines for submission of information and evidence, and communicated by email with John Doe over the next several days. Doe was not informed of his right to petition to have any of the board removed for bias, the right to have adequate time for preparation or the right to be fully informed of the nature, rules and procedures of the campus judicial process.[7]  Less than 24 hours before the Hearing, defendant Bergeron sent an email to John Doe stating that defendant Keyes was substituted as the chair.  Doe had no opportunity to investigate defendant Keyes prior to the Hearing to enable him to object to the participation of Defendant Keyes at the Hearing.  Only later did he learn of Defendant Keyes' involvement with and sponsorship of numerous anti-assault activities on campus, including the showing of the graphic movie, The Hunting Ground, the night before the Hearing.

44.     According to the SMDB policy, the chair's role is as  "procedural coordinator and advisor responsible for ensuring the judicial process follows procedures of fair practice." (Ex. A, pg. 32) A transcript of the hearing is not yet available, but the hearing proceeded substantially as follows:

      a.  Doe and his lawyer entered a room where the board members were seated. Doe and his attorney were placed on one side of an opaque partition.  Smith was then brought into the room with an advisor and was seated on the opposite side of the partition.  Both parties faced the Chair and could be seen and heard by all Board members.  There was no visual or verbal contact between the parties, although both could hear the other's statements.  Keyes, as chair, read a script that outlined the process that would be followed, including that the hearing would be audio-recorded, but that the deliberations would not be.  Upon inquiry, John Doe was assured that defendant Keyes would not

---

[7] These rights are set forth, with numerous others, on the last page of the *Sexual Violence Policy*, access to which Doe was not directed to in preparation for the Hearing.

participate in the deliberations of the Board, but would attend merely to ensure procedural compliance and fairness.

b.  Keyes read from a script what he described as "the alleged violations," which were the definitions of sexual misconduct and sexual assault published by Clark in the *Student Handbook*, and not any specific information about how the violations were alleged to have occurred.  The definition of sexual assault includes the following description of consent:

> Effective consent is defined as a freely and affirmatively willingness to participate in sexual activity, expressed either by words or clear, unambiguous actions.  It is the responsibility of the initiator of sexual activity to ensure that he or she has the other person's consent to engage in sexual activity. Silence, in and of itself, cannot be interpreted as consent.  Consent must be present throughout the sexual activity by all parties involved.

c.  Nowhere in his script did Keyes discuss the burden of proof or what information the board to make a determination. At no time, either through his meeting with Defendant Bergeron, through emails or at the Hearing, was Doe put on notice that he would be required to prove that effective consent was present.

d.  Smith read the same written statement that Defendant Bergeron had previously read to Doe.  In that statement, Smith testified that Doe had texted her and asked her to hang out; that they arranged to meet at Smith's room when Doe returned to the dorm from being out; that Smith voluntarily accompanied Doe to his room at about 1:00 a.m., where they got food and cooked it; that while they were eating, they flirted and made out while his roommate slept in the lower bunk; that she sat on his lap and began to make out; that he touched her on the breasts and kissed her, and she was not comfortable with that; that she sat on the floor to get him to stop; that it was getting late and he asked if she wanted to stay over; that she got into his bed on the top bunk; that he soon followed her; that they began to make out again; that she removed her own shirt; that he took her pants off and then his; that she did not verbally consent to penetration; that she touched

12

him on his neck and back and hugged and kissed him during penetration; that at no time did she push him away or ask him to stop; that she mentioned birth control and Doe said he would "pull out."; that he then rolled over and went to sleep; that she stayed awake all night and went back to her room in the morning. (Exhibit C)

e.   In response to questions posed by Board members, Smith also stated that she thought she and Doe would just engage in foreplay and nothing more.  When asked about this, she admitted that she did not communicate that to him.  She said that she did not believe she needed to tell him "no," because her silence meant "no."

45.   When it came time for Doe to ask questions of Smith, Keyes' conduct was extremely interfering. Keyes consistently attempted to change the tenor of the questions, and by rephrasing and refusing to ask questions, directed the cross-examination in a way that unfairly inhibited Doe's ability to prompt useful responses from Smith:

f.   Doe:  "Why did she stay undressed?"  Keyes:  "That's irrelevant.  I'm not going to ask that."

g.   Doe:  "Why did she stay all night?"  Keyes:  "Not relevant."

h.   Doe:  "Why did she get into my bed and not on the couch?"  Keyes:  "Not relevant. There's no question that she got into your bed."

i.   Doe:  "Why would she take her clothes off?"  Keyes:  "Do you recall taking any of your clothes off?"

j.    When Doe asked: "How did she communicate that she wanted foreplay and nothing more?" Keyes tried twice to restate the question:   "At any point did you communicate consent to physical activity?" "Did you give consent to any form of physical activity?" Doe objected each time and insisted on the form of the question as he had asked it.

46.     When Doe attempted to introduce records from his cellphone service provider showing consistent and continued text messages, including the first message after Smith left his room, which was initiated by Smith, and for several days after, Keyes rejected the records as irrelevant.

47.     Unrefuted testimony by Doe, through his statement and in response to SMDB members included that, when he asked her if she wanted to stay over, she said that she "[didn't] want this to be a one time thing"; that, although there was a couch in the room, Smith got into Doe's bed while he went into the bathroom; that when he returned to the room, she was in his bed, and when he got in with her they began to make out; that she took off her shirt; that he removed his clothes, and then tugged gently at the sides of her pants; that she raised her hips so he could remove her pants; that they continued kissing and hugging during intercourse; that she said something about being on the pill, and at about the same time his roommate began to stir, so he ended the intercourse; that Smith remained undressed in bed with him for the remainder of the night; that Smith said "goodbye" and left the next morning; that the two continued texting often but were very busy with their new schedules; that Smith got mad the following weekend because Doe was not spending enough time with her and broke off the relationship. (Exhibit D)

48.     Smith asked no questions of Doe when given the opportunity.

49.     CW then entered the room and testified that he was present during the entirety of the engagement between Doe and Smith; that he heard nothing that caused him concern.

50.     Doe and Smith gave closing statements. While Doe had not previously been informed about the process that would be followed, Smith, was apparently aware because she had a typewritten statement prepared.

<u>CLARK'S SANCTION OF DOE WAS UNFAIR</u>

51.     The day after the hearing, Doe received an emailed letter of decision from Defendant Keyes in which he spoke on behalf of the SMDB, sharing the reasoning behind the board's decision to find him in violation of the Clark policy.  Keyes was the only signator of the SMDB decision. A true and correct copy of the decision is attached hereto as Exhibit E.  Although Keyes had been clear during the

Hearing that his role was purely procedural in the deliberations, he articulated in the letter the specific

thoughts and concerns of the board members:

      a.   The Board found Doe not responsible for violating the Sexual Misconduct provision of

           The Code of Student Conduct.  Sexual misconduct is defined at Clark as:

> "any intentional sexual touching, however slight, with any object by one
> person upon another person without effective consent.  Sexual touching
> includes any bodily contact with the breasts, groin, genitals, mouth or other
> bodily orifice of another, or any other bodily contact in a sexual manner.
> Any disrobing of another or exposure to another by a man or woman
> without effective consent is considered a violation of this policy." (Ex. A,
> pg. 23)

      b.   The Board found Doe responsible for violating the Sexual Assault provision of The

           Code of Student Conduct.   Sexual Assault is defined at Clark as:

> "any sexual penetration (anal, oral or vaginal), however slight, with any
> object, or sexual intercourse by a person upon another person without
> effective consent.  Sexual penetration includes vaginal or anal penetration
> by a penis, object, tongue or finger and oral copulation by mouth-to-genital
> or genital-to-mouth contact." *Id.*

52.     The letter states that the SMDB "invokes an evidentiary standard of 'clear

and convincing' although the Office of Civil Rights recommends a standard of

'preponderance of the evidence.' "  He expressed the reasoning of the board, stating, "with

so many conflicting statements and so much ambiguity about what happened that evening,

the board ultimately found that there is clear and convincing evidence and a preponderance

of evidence that you sexually assaulted the complainant." (Ex. E, pg. 2)

53.     A no-contact order was imposed immediately, and Doe was dismissed from Clark, and

had to vacate his dorm, effective at 12:00 p.m., May 6, 2015.  The dismissal was characterized as an

"opportunity" for Doe to continue at Clark, that could be exercised no earlier than January 18, 2016.

      a.   Doe can be readmitted only upon an interview with the dean.

      b.   If Doe is readmitted, a no contact order with Smith will be in place through the duration

           of his enrollment.

     c.   Upon return, Doe will be required to complete educational training on consent activity.

     (Ex. E, pgs. 2-3)

54.     Keyes referred Doe to the "fair practices" in the Handbook to identify a basis upon which he could appeal the decision and directed Doe to deliver his appeal to Defendant Darrigrand within five calendar days.  (Ex. E, pg. 3)  He also directed Doe to the appeals procedure in the *Student Handbook* for "specific guidelines" on which an appeal must be based.  According to both the letter and the fair practices procedure, an appeal must be predicated upon a violation of "fair practices," or new evidence.

55.     Doe was found responsible, by a majority vote, based on a finding of conflicting and ambiguous evidence, which cannot meet even a "preponderance of the evidence" standard.

<u>CLARK'S APPEALS PROCESS IS FUNDAMENTALLY UNFAIR</u>

56.     Doe delivered a memo outlining the basis of his appeal, as instructed, to Defendant Darrigrand, on April 27, 2015.  (Exhibit F) At that point, Defendant Darrigrand was effectively reviewing her own work:  she had received the initial complaint and decided to move forward with the violation, she was the person who reviewed and validated the SMDB's decision, and now was identified as the person who would be deciding the appeal.

57.     Defendant Darrigrand responded to Doe's appeal in a letter dated May 4, 2015, and attached hereto as Exhibit G.  In that letter, Darrigrand claimed both the UJB and the SMDB use the "preponderance of the evidence" standard, erroneously quoting the *Student Handbook,* and disregarding the *Sexual Violence Policy*.  (Ex. G, pg. 2).  She then referred to the *Sexual Violence Policy*'s definition of consent, selecting portions of Clark's policies that supported the dismissal, disregarding the ambiguities.  She denied the appeal and affirmed the sanctions. *Id.*

58.     The *Student Handbook* states that while the decision of the provost or his designee is final, the president of the University may amend or alter decisions.  (Ex. A, pg. 34)  Doe appealed to Defendant Angel through his attorney by certified letter dated May 26, 2015, attached hereto as Exhibit

H.  At that time, Doe had retrieved actual text messages between Smith and himself, and offered to produce them for review by Defendant Angel.

59.     Defendant Angel finally responded by email on June 22, 2015, attached hereto as Exhibit H, wherein he claimed to have reviewed "all materials regarding the complaint," without acknowledging that there may be exculpatory evidence.  He denied Doe's appeal, concluding that the sanctions imposed were "responsive to the totality of the evidence."  In that email, he referred to the sanctions as a "path" provided for Doe to complete his degree at Clark.

<u>CLARK DISCRIMINATED AGAINST JOHN DOE BASED ON HIS GENDER</u>

60.     Beginning with the initial complaint, Clark gave preferential treatment to Smith because she is a female.

61.     Clark failed to question or investigate the claim of Smith, adopting it as true and pursuing a violation against Doe.

62.     Doe was perceived as the "initiator" of the sexual encounter, therefore responsible for ensuring consent, even though Smith made the statement "I don't want this to be a one time thing," and got into his bed, voluntarily, when he left the room to go into the bathroom.   When Doe followed Smith's lead by kissing her and touching her, Smith did not withdraw consent:  she removed her shirt. But the responsibility for the actions that followed were attributable solely to Doe, and he as the male, was punished. Smith made many excuses or reasons for continuing to engage physically, including being scared about how she would look and what Doe may say about her, *thinking* "I need to do this," trying to be nice, wanting the situation to be and feel normal, and believing that "it had already started happening and I couldn't go back." But she also admitted that she did not in any way communicate these things to Doe. She raised her hips to effect removal of her pants, reasonably communicating to Doe an act of unambiguous consent, in light of the circumstances.  She continued to touch and kiss him, none of which could reasonably imply ambiguity or withdrawal of consent to their continued interaction. Once they began to have intercourse, she "*thought,* please stop, please stop, I'm going to get pregnant" but did not

17

say it out loud. When she mentioned birth control, Doe ended the intercourse. Doe, in his statement that they were "totally in agreement about what we were doing."  When the Board asked Smith how her body language communicated to him that she was not comfortable, she answered, "pulling away from him when I was on his lap.  In bed, I was not fighting back but wasn't—I don't think I was enjoying myself.  I would have expected someone to ask what I wanted, but I never got that."  When asked how she communicated her intent to engage in foreplay but nothing further, her response was "I was kissing him back but I did not consent to penetration.  They shouldn't be connected.  I don't think I needed to communicate separately twice.  I was silent and that should have been enough.  He didn't ask for sex.  He said, "sleep," so I thought "sleep."  I was okay with foreplay but nothing else."

63.     On the webpage for its CAVE program, identified in paragraph 20 above, Clark offers guidance in what is considered "consent." "Consent 101 or:  Doing It with the Lights On," explains that consent does not have to be verbal:  "People can express consent non-verbally by nodding, removing clothes, proceeding with the proposed activity, etc., " which is consistent with Doe's unrefuted testimony.

64.     While Smith claims that her thoughts conflicted with her actions, the *Sexual Violence Policy* states that "withdrawal of consent requires clear communication because 'you cannot be expected to read the mind of your sexual partner.' " (Ex. B, pg. 4)

    a.  The consent policy suggests but does not require a party to obtain verbal consent to ongoing sexual acts. Physical communications of consent that are clear and unambiguous are consistent with the policy.

    b.  In none of its policies or documentation is consent is affected by whether one of the parties enjoyed the sex.

COUNT I

CLARK UNIVERSITY BREACHED ITS CONTRACT WITH DOE

65.      Plaintiff restates and alleges each of statements contained in paragraphs 1-64, as if fully restated herein.

66.      John Doe had a contract with Clark, pursuant to which he was entitled to obtain an undergraduate education and bachelor's degree in four years, provided he met all of the requirements for graduation, including those imposed under the *Student Handbook.*

67.      John Doe and Clark had mutual expectations, based on their contract, that certain rules would be followed by each of them, including that Clark would provide a disciplinary procedure that would be fairly and evenly administered through a judicial process that follows procedures of "fair practice" from investigation through sanction, in a way that is not arbitrary and capricious.  The *Student Handbook* outlines certain rights that students enjoy including, in the case of alleged violations of sexual misconduct, a confidential process that includes Clark's commitment to take "immediate and appropriate action to investigate" such allegations, and a hearing board comprised of members who "understand the complexities and legal implications" of such allegations. (Ex. 1, pg. 31)    Under his contract with Clark, John Doe was entitled to complete his educational pursuits unless and until he was found in violation of Clark's policies in a process that met all of the above criteria.

68.      The *Sexual Violence Policy*, incorporated by reference as part of the *Student Handbook*, guaranteed John Doe numerous other rights, including the right to "investigation and appropriate resolution" of allegations of sexual misconduct, the right to be fully informed of the rules and the procedure of the campus judicial process; the right to "adequate time for preparation"; the right to appeal in accordance with the standards for appeal established by the institution; the right to petition that any member of the hearing board be removed for bias; the right to have university policies and procedures followed without material deviation; the right to a "fundamentally fair hearing and fair practice."

69.     The *Student Handbook* also states students attending Clark will be free from discrimination based on gender, and will have a reasonable expectation of privacy in their personal lives.

70.     Clark breached all of these obligations.

Failure to Conduct Any Investigation

71.     Both as indicated by the immediate scheduling of a hearing in this matter and by Defendant Darrigrand's admission, Clark failed to investigate the allegations made by Smith.  Upon information and belief, the complaint was tendered to Defendant Darrigrand at 5:00 p.m. on a Friday evening.  By Sunday evening, Doe was evicted, and on Monday, he was contacted by Defendant Bergeron and notified of the schedule of interviews and hearings to be conducted.  Although Clark identifies their requirement to investigate allegations no less than three times in the various statements of their policy, they failed to seek any evidence or witness statement to corroborate the allegations. Because the reporting of the alleged assault happened approximately three months after Doe and Smith's encounter, the adoption of Smith's complaint without investigation, coupled with the very limited time frame allowed Doe to locate or produce any evidence to defend himself, Doe was denied a fundamentally fair process.

The Board Had Insufficient Evidence to Find A Violation

72.     In applying the policy as stated and defined in the various parts of the *Student Handbook* and the *Sexual Violence Policy*, and in the broadest interpretation of those words, the SMDB must have found that the complainant proved by a preponderance of that (a) Doe knew that Smith did not consent; or (b) Doe used force, coercion or intimidation to obtain consent; or (c) Smith was incapacitated and unable to consent.  Smith was not incapacitated, and there was no issue regarding the involvement of alcohol or drugs at all in this case, so (c) is not an option.  As to (a), Smith's consent was indicated by clear and unambiguous physical actions as explained above and as related to the SMDB, and (b) there was no evidence or testimony that Smith was forced, coerced or intimidated by Doe in any way.  The

totality of the circumstances, even disregarding the evidence that was excluded from consideration by the board, reveals one sexual experience between two consenting adults.

A Fair and Equitable Hearing Process Based Including "Fair Practices"

73.    In Doe's case, a pre-hearing meeting and a hearing were scheduled prior to Doe even learning of the allegations against him.  While fair practices suggest and OCR mandates that an investigation be conducted to determine whether judicial actions are warranted, it simply was not done. Fair practices, as written, provide no safeguards or assurances of fairness in allegations of sexual assault.

74.    Doe did not receive the notification about the hearing procedures as promised by Defendant Bergeron.  All of the information he garnered from her was in response to emails he initiated. Because of this, he had no opportunity to investigate or object to any of the persons who served on the board.  When Defendant Keyes was appointed at the last minute to replace Defendant Bergeron, this violated the policy for the SMDB set forth in the *Student Handbook*.  There was no opportunity for Doe to object to Keyes chairing the board, and Doe had no time to investigate before the hearing, so he could not have known that Keyes was one of the most active members of the campus in the campaign against sexual assault. There was no explanation for this substitution, and when Doe expressed concern about Keyes participation in the deliberations, Keyes assured him that he would not be participating.  As the author of the sanction letter, however, Keyes obviously was intimately involved in the decision-making. He even took the opportunity to personally admonished Doe to learn from this experience.

75.    The remaining members of the SMDB were faculty and staff who, as with Keyes, had no legal background, and yet were responsible for applying legal principles to evidence.

76.    Keyes obviously was aware that Clark's policy was unclear, as he referred to two legal standards in his decision letter. By definition, as argued by Doe in his appeal, "conflicting and ambiguous" cannot equate to "more likely than not" and certainly not to  "clear and convincing." In the disciplinary file, a document bearing Keyes' name responds to Doe's claim that the burden had been shifted by stating," "[t]here is no burden on the complainant to that consent was denied." Exhibit I.

Promising But Failing to Honor Basic Tenets of Fair Practices

77.     The *Student Handbook* guarantees students that fair practices will be followed in allegations of sexual assault cases. Defendant Darrigrand has admitted that Doe was denied what Clark refers to as "fair practice" procedures.  In her response to Doe's appeal, she stated, "the procedures of the Sexual Misconduct Hearing Board do not provide an opportunity to accept responsibility in the procedural outline" and  "the step of a pre-hearing does not exist for the Sexual Misconduct Hearing Board." (Exhibit ,  paragraphs 1A and 1C.)  The procedures of fair practice, according to defendant Darrigand, were simply inapplicable to cases of sexual assault.

78.     Further, while the SMDB must only reach lowest legal standard by a majority vote to find someone responsible for sexual assault, UJB must reach a majority vote by the much higher standard of "clear and convincing" evidence that a student is in violation of such minor infractions such as tampering with a window screen or smoking within 20 feet of a building.

Doe Had a Right to Privacy and To Be Treated With Respect

79.     The *Sexual Violence Policy* sets forth certain rights afforded the accused, including the right to be treated with respect by university officials. *Id.*   From the moment Smith filed her complaint with Darrigrand, Doe was disrespected.  He had never been found in violation of the Housing Contract, b but two uniformed female police officers knocked on his door at about 9:00 p.m. on Sunday, April 12, 2015, when most of the residents were in the dorm and ordered him to vacate within an hour.  They provided a key and location, but no explanation.  It was not until late the next day that he received an email stating that an allegation had been made against him.  In situations where there is an allegation of sexual misconduct, the *Sexual Violence Policy* (Ex. B, page 8) states that the complainant may make a request for a change of room, but the university "may not force the perpetrator to move simply based upon the accusing student's request."  When this was raised, Defendant Darrigrand stated that Doe was removed because "RLH has the right to move a student if continued residency is deemed detrimental to the community.  In this case, separation of a complainant and a respondent provides a boundary and

safety for both parties involved."  (Ex. G, pg. 2 ) Doe and Smith were housed in the same dormitory on

different floors for the entire school year.  They had been living in the same dormitory for nearly three

months since they broke up, and there were no allegations of any disruption of or detriment to the

community during that time.   This was a blatant act on behalf of the administration to shun Doe and

promote rumor and innuendo about the reason for his removal.

COUNT II

CLARK VIOLATED THE COVENANT OF GOOD FAITH AND FAIR DEALING (V. CLARK)

80.     Plaintiff restates and alleges each of statements contained in paragraphs 1-79, as if fully
restated herein.

81.     Massachusetts contract law mandates that every contract entered in the Commonwealth
contain an implied covenant of good faith and fair dealing, and this contract is subject to that
requirement.

82.     Clark breached its covenant of good faith and fair dealing in its failure to investigate Sue
Smith's allegation, in the conduct of the hearing and the sanctions imposed on Doe, and in its failure to
consider extrinsic evidence offered both at the hearing and during the appeal process.

83.     The *Sexual Violence Policy* states that false reports will not be tolerated.  (Ex. B, pg. 10)
When Doe claimed, both during the pre-hearing interview and in his SMDB testimony, that this was a
false allegation, Clark failed to investigate.  When Doe identified his witness, Clark tasked him with
obtaining a statement from that witness for use at the Hearing.  They refused to do consider that Smith
had violated the policy, which constitutes a selective enforcement of policies in favor of Smith.

84.     The SMDB policy is that a majority of the three-member board, which under the UJB
would be considered a "simplified board" must find the accused responsible. This means that, in cases of
the most serious allegations where an accused student faces the harshest of sanctions, there are no
options or safeguards to ensure fairness and impartiality.  Further, the standard of proof is significantly
less than the standard in allegations of minor infractions such as unauthorized soliciting.

23

85.     Clark breached its covenant of good faith and fair dealing in shifting the burden of proof to Doe, without notice, so that he was denied the fairness of an impartial hearing. As stated above, Keyes chaired this Hearing from the perspective that Doe had the sole burden of proving his case. This shift is a departure from any type of judicial process, and any intention to invoke this shift should have been explicit in the documentation discussing fair practices.

86.     As a result of Clark's breach, the plaintiff has suffered damages as stated above.

## COUNT III

## TORTIOUS INTERFERENCE (V. INDIVIDUAL DEFENANTS)

87.     Plaintiff restates and alleges each of statements contained in paragraphs 1-86, as if fully restated herein.

88.      The individual defendants were aware of the contractual relationship between plaintiff and Clark, as well as the obligations, rights and responsibilities that each owed to the other, as contained in *Student Handbook*.

89.     The individual defendants intentionally and maliciously interfered with this contractual relationship as set out above. The individual defendants failed to provide plaintiff with a fair, unbiased and non-discriminatory disciplinary process that included a thorough investigation and a fair hearing and appeal process. As a result of the conduct of the individual defendants, the plaintiff has suffered damages as stated above.

## COUNT IV

## CLARK'S POLICY REGARDING SEXUAL ASSAULT VIOLATES 20 U.S.C. § 1681 (TITLE IX) (V. ALL DEFENDANTS)

90.     Plaintiff restates and alleges each of statements contained in paragraphs 1-89, as if fully restated herein.

91.     Title IX of the Education Amendments of 1972 requires, and the United States Department of Education Office of Civil Rights ("OCR") enforces, that colleges receiving federal funds must prohibit discrimination the basis of sex.

92.     OCR requires that federally funded colleges provide "prompt and equitable" procedures for addressing Title IX complaints.  This includes, at minimum, an "[a]dequate, reliable, and impartial investigation of complaints." DOE Dear Colleague Letter of April 2011.

93.     OCR requires that the "preponderance of the evidence" standard be used to determine violations of sexual assault policies.

94.     In allegations of sexual assault, Clark takes the position that "there is no burden on the complainant to prove that consent was denied,"  which means that Clark places the burden of proof on the accused.  In order to warrant judicial action, therefore, the complaint must contain enough evidence to meet the "preponderance of the evidence" threshold.

95.     In addition to OCR's requirements, Clark requires "effective consent" be present in sexual relations between students.  In determining whether effective consent was present, Clark focuses exclusively on the status of consent at the moment of penetration is initiated.  The initiator of the particular action is responsible for ensuring consent.  Evidence of what happened before, during or after, putting the event into context, is disregarded as irrelevant, as indicated herein.

96.     In light of these factors, the Clark University disciplinary policy is inherently discriminatory against male students when there is an accusation of sexual assault by penetration. First, a claim filed by a student, claiming to have been assaulted by a male student, infers that the male student was the initiator because he is anatomically capable of penetration.  At a hearing, it is irrelevant whether the male student testifies that clear and unambiguous physical and/or verbal consent was present throughout.  A complainant, in her complaint, can negate her original words or acts by claiming consent was given based on fear, intimidation or coercion.  The male student has absolutely no way to refute these claims without being able to put the interaction into context, which he is prohibited from doing,

because any evidence outside the moment of penetration is deemed irrelevant.  Additionally, the CAVE program in its published documentation, states that cooperation ("when someone says yes because he is too scared or intimidated to say no") or compliance ("when someone says yes because giving in physically and mentally is the easiest thing to do") are other defenses to consent. [8] All of these ways of denying consent rely on the claimant's thoughts, beliefs and feelings, and all can be expressed in the complaint without the complainant having to offer proof.  Verbal silence even accompanied by physical acts is interpreted against the accused, as in this case; and verbal consent, as indicated above, can be premised upon the belief that "it had already started happening and I couldn't go back," meeting the characterization of compliance, as stated by Smith in her testimony.  This forum is completely biased against the male student when judgment of whether effective consent is present is not only premised upon what the complainant outwardly expressed, did or said, but what she now claims she was thinking or feeling.

97.     In this case, the board artificially dissected the sexual activity into a series of static moments, and only considered the moment of penetration and whether the accused can prove consent was freely given at that moment.  If effective consent could not be proven to the board in this case, with the unrefuted evidence including comments of Smith stating, "I don't want this to be a one time thing," crawling into his bed, removing her shirt and then assisting in the removal of her pants, and kissing, hugging and touching him throughout the physical interaction, and where alcohol was not a factor,  then the scale cannot be tipped in favor of exoneration in any case.

98.     Clark has been apprised of the plaintiff's position and of the discovered exculpatory evidence, which it has refused to consider or investigate.

99.     Clark has failed to remediate its discriminatory actions against plaintiff, and as a result, plaintiff has suffered damages as described above.

---

[8] www.clark.edu/offices/cave/consent/

COUNT V

<u>MASSACHUSETTS CIVIL RIGHTS ACT (G.L. C. 12, §§ 11H, 11I) (V. ALL DEFENDANTS)</u>

100.    Plaintiff restates and alleges each of statements contained in paragraphs 1-99, as if fully restated herein.

101.    The plaintiff has a right to be educated by Clark, in a manner consistent with its promises and statements, both as written in the *Student Handbook* and as required by federal and state law, including being subject to a judicial process, in the event of a complaint, that is free from discrimination, fair in its intent and application.

102.    In the intense climate of activism among its students, faculty and staff in seeking out and punishing events of sexual assault, the administration was both under pressure to identify and sanction a male student for assaulting a female student, and eager to demonstrate its commitment to this cause.

103.    The individual defendants were involved with and encouraged participation and attendance at the various demonstrations, and then appointed themselves the prosecutor, judge, jury and reviewers of the matter.  In their efforts to take a stance on sexual assault, these biased officials made an example of Doe, conducting an inadequate, unfair, and discriminatory and invasive judicial process that found him responsible for sexual assault against Smith.  Clark and these individual defendants chose to interfere with Doe's rights, which caused significant damages as discussed above.

104.    The very public eviction of Doe from his dormitory room, prior to determining the efficacy of the complaint, drew enough attention to him that his privacy was compromised and he has been the target of consistent inquiry about the alleged assault and dismissal from the school.

105.    This conduct is a violation of the Massachusetts Civil Rights Act, G.L. c. 12 § 11H, a violation which has caused plaintiff to suffer significant damages.

COUNT VI

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (V. ALL DEFENDANTS)

106.    Plaintiff restates and alleges each of statements contained in paragraphs 1-105, as if fully restated herein.

107.    The conduct of the defendants was extreme and outrageous, beyond the cope of common decency and intended to cause severe emotional distress to plaintiff.

108.    As a result of the actions of the defendants, plaintiff has suffered severe emotional distress beyond what any reasonable person should be expected to suffer.

COUNT VII

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (V. ALL DEFENDANTS)

109.    Plaintiff restates and alleges each of statements contained in paragraphs 1-108, as if fully restated herein.

110.    Plaintiff also asserts that defendants acted negligently in breaching their duties of care owed to the plaintiff.

111.    As a result of the defendants' negligence, the plaintiff has suffered severe emotional distress with physical manifestations that any reasonable person would suffer in the same circumstances.

COUNT VIII

INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

112.    Plaintiff restates and alleges each of statements contained in paragraphs 1-111, as if fully restated herein.

113.    Clark has committed numerous violations of Doe's contract and of federal and state law.

114.    Doe's education and future has been severely affected and he has suffered extensive damage from Clark's actions.  Without appropriate redress, the unfair outcome of the SMDB hearing involving Sue Smith will continue to cause Doe damages by way of missed educational opportunities and career opportunities, as well as damage to his reputation and continued emotional distress.

115.     Based upon Clark's failure to conduct an investigation, failure to provide a fair and impartial hearing process, failure to conform to and fairly apply the legal standards of evidence as intended by OCR, plaintiff requires that the College be ordered to remove the "Dismissed" notation from the plaintiff's transcript, reinstate plaintiff immediately to his full prior academic status, reinstating all benefits, scholarships and participation privileges, and removing any constraints or limits that were imposed as a result of this decision, and allow plaintiff to continue his studies to earn his degree, and take all appropriate actions to correct any and all statements made to any source in any format that stated or implied that John Doe had violated the Code of Student Conduct.

116.     Doe requests this Court declare that Clark's policies, as applied, are unconstitutional.

WHEREFORE, John Doe, as plaintiff herein, respectfully requests this honorable Court grant him relief as follows:

1.     Allow the declaratory judgment as herein requested;

2.     Allow a trial in this matter, and enter a judgment for the plaintiff on each Count of this complaint, awarding him damages in an amount to be determined at trial, as well as attorney's fees and costs;

3.     Grant all other such relief as this Court deems just and equitable.

<u>JURY DEMAND</u>

JOHN DOE hereby makes demand for this case to be tried by a jury insofar as the claims herein are triable.

Date:  August 4, 2015                              JOHN DOE,
                                                   Through his attorney,

                                                   _/s/ Terri D. Leary_____
                                                   Terri D. Leary, Esq. (BBO #681413)
                                                   Leary Legal Services, LLC
                                                   446 Main Street, Suite 1510
                                                   Worcester, MA 01608
                                                   (508) 796-5691
                                                   Fax:  (508) 798-8006